**UNITED STATES of America, Plaintiff,**

v.

**John Bradley NASH, Defendants.**

**No. 5:13–CR–95–KOB–JHE.**

United States District Court, N.D. Alabama, Northeastern Division.

March 5, 2014.

---

Joyce White Vance, U.S. Attorney's Office, U.S. Probation, United States Probation Office, USM, United States Marshal, Birmingham, AL, Mary Stuart Burrell, U.S. Attorney's Office, Huntsville, AL, for Plaintiff.

Jake Watson, Watson Graffeo PC, Huntsville, AL, for Defendants.

*SENTENCING MEMORANDUM*

KARON OWEN BOWDRE, Chief Judge.

An odd day arises when a young man, who could legally have consensual sex with his sixteen-year-old girlfriend, will forever be labeled a sex offender for receiving provocative pictures of her that she sent him via text message. Such is the day of modern technology; a day when we not only combat the despicable perversion of child pornography, but also must account for the rampant proliferation of "sexting"[1] among teenagers and young adults. This court, and other district courts across the nation, bear the burden of taking into account these realities of this age of technology, while still imposing a sentence that is "sufficient, but not greater than necessary" to meet the purposes of sentencing. 18 U.S.C. § 3553(a).

This matter came before the court for the sentencing of twenty-two-year-old Defendant John Bradley Nash, who has pled guilty to one count of possession of child pornography. This memorandum opinion supplements findings made on the record at the sentencing hearing on November 7, 2013.

### BACKGROUND

For the reasons stated on the Record and further explained below, the court sentences the Defendant John Bradley Nash to 60 months probation with special conditions. The court imposes this unusual sentence because of unusual circumstances.

The government filed a one-count information on March 11, 2013 against John Bradley Nash. Count one charged that on or about June 28, 2012, he possessed child

---

**1.** Merriam–Webster defines "sexting" as "the sending of sexually explicit messages or im-   ages by cell phone." m-w.com, "sexting."

pornography. On April 29, 2013, Mr. Nash pled guilty to that charge.

As a result of the execution of a sealed warrant and the review of the Defendant's computer and cell phone, investigators found images of 16–year–old female E.L. on Nash's cell phone. These four images showed E.L. involved in lewd and lascivious behavior that qualifies as child pornography.[2] During an initial interview, E.L. admitted that she was in a consensual sexual relationship with Nash and that she took the pictures of herself and sent them to Nash. During a subsequent interview, E.L. stated that Nash persuaded her to take the pictures of herself but Nash denies that he persuaded E.L. to take the pictures.

According to the presentence report, the base offense level of 32 was calculated as follows:

> The guideline for 18 U.S.C. § 2252A(a)(5)(B) offenses is found in USSG § 2G2.2 of the guidelines. However, according to the cross reference at § 2G2.2(c)(1), if the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, § 2G2.1 is to be applied if the resulting offense level is greater. The defendant caused and requested E.L. to send images of herself involved in lewd and lascivious behavior. Therefore, the base offense level is 32 pursuant to § 2G2.1(a), which is greater than that calculated at § 2G2.2.

(Presentence Investigation Report, ¶ 14).

Upon Mr. Nash's objection, however, the court found that he did not admit facts that supported the applicability of § 2G2.2(c)(1); the Government offered no testimony on these disputed facts. Therefore, the court did not apply that provision without evidence from which to make a factual determination. Instead, the court applied the base offense level from § 2G2.2(a)(1), which is 18, because the Defendant was convicted of a violation of 18 U.S.C. § 2252A(a)(5)(B).

Two levels were added according to § 2G2.1(b)(2)(A) because the offense involved sexual contact; one of the four photos showed E.L. inserting her finger into her vagina. No other enhancements applied, so the adjusted offense level was 20. Mr. Nash received the maximum of three levels reduction for acceptance of responsibility, resulting in a total offense level of 17. Combined with a criminal history category of I, based on a criminal history score of zero, the resulting guideline range was twenty-four to thirty months.

### The Sentencing Hearing

The court held a sentencing hearing on November 7, 2013. Prior to the hearing, the court received and reviewed the Presentence Report, a forensic psychosexual evaluation of Mr. Nash, and numerous letters from Mr. Nash's friends and family. During the hearing, the court heard testimony from Matthew Moe, a long-time friend of Mr. Nash; Dr. Frankie Preston, Mr. Nash's psychologist; Mr. John Nash, Mr. Nash's father; and Mr. Nash himself.

### ANALYSIS

The court has serious concerns about the appropriateness of the Guidelines sentence in this case. The court is not alone in this view, as other courts have expressed similar concerns with the Sentencing Guidelines, particularly as they apply to child pornography cases.

---

**2.** A total of ten images were found on Nash's phone, but six of those images were duplicates of the four different images.

For example, Judge Mark Bennett, from the Northern District of Iowa, has expressed concern about the Sentencing Guidelines generally. He noted that after they were implemented, "discretion in sentencing was shifted from judges to prosecutors" and "prosecutors largely controlled sentencing because things like mandatory sentences and guideline ranges were determined by decisions they made."[3] According to Judge Bennett, the change "not only resulted in a remarkable surge in incarceration, [but] it does not seem to solve the problem of disparities." *Id.*

Specifically addressing the child pornography guidelines, Judge James L. Graham, from the Southern District of Ohio, recently noted that "[t]here is widespread agreement among judges, lawyers and legal scholars that the guidelines for child pornography offenses are seriously flawed." *United States v. Childs*, 976 F.Supp.2d 981, 982, No. 2:13–cr–96, 2013 WL 5512846, at *1 (S.D.Ohio October 2, 2013). Judge Graham points out that the Sentencing Commission itself has "publicly declared that the existing guidelines for child pornography offenses were flawed in need of repair"[4] and notes that the Department of Justice "expressed its agreement."[5]

This court's concern is aptly articulated by the Second Circuit in *United States v. Dorvee*, 616 F.3d 174 (2d Cir.2010). Although the case is not controlling, the reasoning is very compelling and is worth recounting here.

In *Dorvee*, the court recognized that the Guidelines for child pornography are fundamentally different than most Guidelines because they were neither developed by the Sentencing Commission nor based on empirical evidence, but instead have been created by a hailstorm of enhancements directed by Congress. *Id.* at 184. The court also noted "the fact that the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Id.* In fact, the Sentencing Commission has openly opposed the Congressionally-mandated changes, and the "§ 2G2.2 sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." *Id.* at 185.

The court in *Dorvee* specifically took issue with the enhancement for use of a computer pursuant to § 2G2.2(b)(6), an enhancement that in 2009 applied to 97.2% of all child pornography cases.[6] More recent studies reveal that the computer enhancement applied to 96.2% of child pornography cases in 2010, 97.4% of cases in 2011,

---

**3.** Mark Bennett & Mark Osler, The wrong people decide who goes to prison, CNN.COM, December 3, 2013, http://www.cnn.com/2013/12/03/opinion/bennett-osler-sentencing/.

**4.** *Childs*, 976 F.Supp.2d at 983, 2013 WL 5512846 at *2 (citing Report to Congress: Federal Child Pornography Offenses (Dec. 2012), www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/2 01212_Federal_Child_Pornography_Offenses/ (visited October 1, 2013)).

**5.** *Childs*, 976 F.Supp.2d at 984, 2013 WL 5512846 at *2 (citing Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy Attorney General, U.S. Dep't of Justice, to Honorable Patti B. Saris, Chair, U.S. Sentencing Comm'n (Mar. 5, 2013), available at http://sentencing.typepad.com/files/doj-letter-to-ussc-on-cp-report.pdf (visited Sept. 30, 2013)).

**6.** *Dorvee*, 616 F.3d at 186 (citing United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2009*, available at *http://www.ussc.gov/gl_freq/09_glinexgline.pdf* (last visited April 19, 2010)).

and 96.4% of cases in 2012.[7] The court then noted that the Guidelines result in virtually no distinction between the sentences for first time relatively minor offenders and those of "the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories. *This result is fundamentally incompatible with § 3553(a)." Dorvee*, 616 F.3d at 187 (emphasis added).

The court in *Dorvee* continued its objection, stating that "[b]y concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant . . .' " *Id.* The court concluded by cautioning district judges to take seriously the broad discretion that they possess in fashioning sentences under § 2G2.2, keeping in mind that they are dealing with an "eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.* at 188. Such is the case here, where a first-time offender, who possessed four different images sent to him by his girlfriend with whom he had a legal and consensual sexual relationship, faced a guideline sentence that maxed out at the statutory maximum of 120 months before this court refused to apply a higher Guideline provision.

The court is particularly troubled by the application of the Sentencing Guidelines to "sexting" cases involving a consensual and legal relationship. Sexting is a widespread phenomena among teenagers and young adults. Regardless of the appropriateness of engaging in such virtual conversations, the court doubts that this behavior is the kind that Congress was targeting when it passed child pornography laws. While Mr. Nash's relationship with E.L. may be inappropriate, it was perfectly *legal* in the state of Alabama where the age of consent is sixteen. *See* ALA.CODE § 13A–6–70(c)(1). The difference in age between Mr. Nash and E.L. was six years, and the difference in maturity levels was likely less than that. Based on the forensic psychosexual evaluation and Dr. Preston's testimony, Mr. Nash was an emotionally immature twenty-two-year-old young man with untreated ADHD who entered into a an ill-advised—but perfectly legal—relationship and received four lascivious picture messages from his sixteen-year-old girlfriend.

Congress desired the Guidelines to avoid sentence disparities and, in most circumstances, the Guidelines are a good place to start in determining a sentence. In this case, however, as in *Dorvee*, a Guidelines sentence would generate an unreasonable result. In *Gall v. United States*, the Supreme Court cautioned that courts not only must guard against unwarranted sentence disparities among similar defendants, but also must consider the need to avoid unwarranted *similarities* in sentenc-

---

**7.** *See* United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics, Fiscal Year 2010*, available at http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_Frequencies/2010/10_glinexgline.pdf (last visited November 13, 2013); United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics, Fiscal Year 2011*, available at http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/ Guideline_Application_Frequencies/2011/Use_of_Guidelines_and_Specific_Offense_ Characteristics.pdf (last visited November 13, 2013); United States Sentencing Commission, Use of Guidelines and Specific Offense Characteristics, Fiscal Year 2012, available at http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_Frequencies/2012/index.cfm (last visited November 13, 2013).

ing defendants who have been found guilty of *dissimilar* conduct. 552 U.S. 38, 55, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). Applying that principle here, the child pornography Guidelines do not truly reflect the kind of conduct involved in this case.

This court focuses on evaluating the § 3553(a) factors in trying to craft a sentence that is sufficient but not greater than necessary to comply with the statutory purpose of sentencing. First, looking to the nature and circumstances of the offense, the court considers the rampant nature of sexting in today's society, particularly among teenagers and young adults. Numerous individuals and organizations have written articles and conducted studies on the topic of sexting in recent years, both within the legal community and outside of it. In March 2009, National Public Radio highlighted the "Disturbing New Teen Trend," noting that states are responding to the problem in "wildly different ways, with everything from felony charges to educational assemblies on the dangers of the Internet." [8]

A 2008 study from The National Campaign to Prevent Teen and Unplanned Pregnancy (NCPTUP) suggested that 22% of teen girls and 18% of teen boys ("teens" are defined as ages 13 to 19) and 36% of young adult women and 31% of young adult men ("young adults" are defined as ages 20–26) are sending or posting nude or semi-nude images of themselves. [9] In contrast, a survey from the Pew Research Center's Internet & American Life Project found that only "4% of cell-owning teens ages 12–17 say they have sent sexually suggestive nude or nearly nude images of themselves to someone else via text messaging" and 15% say they have received such images of someone they know. [10] Although the article *Stemming Sexting: Sensible Legal Approaches to Teenagers' Exchange of Self-Produced Pornography* aptly notes that the numbers from either study should be viewed with skepticism given both the questionable survey methods—particularly with the NCPTUP study—and the amount of social disapproval associated with the topic, no one disputes that sexting is a significant phenomenon among teenagers and young adults today. [11]

The article continues to point out: "The concern that sexted images can be easily distributed over peer-to-peer networks or otherwise fall in to the hands of sexual predators ... is not a risk most teens recognize. Nor do most teens realize that their actions are illegal and could qualify them for a decades-long sex offender registration requirement." *Id.* at 562.

In recent years, many young people—like Mr. Nash—have come face-to-face with these unintended consequences. For example, an eighteen-year-old Florida man was convicted of distributing child pornography after sending nude pictures of his sixteen-year-old ex-girlfriend to her friends and family in a fit of anger over

---

**8.** Chana Joffe–Walt, *'Sexting': A Disturbing New Teen Trend?*, NPR (March 11, 2009, 2:48 PM), http://www.npr.org/templates/story/story.php?storyId=101735230.

**9.** *See* The National Campaign to Prevent Teen and Unplanned Pregnancy, *Sex and Tech: Results from a Survey of Teens and Young Adults* (2008) http://www.t henationalcampaign.org/sextech/pdf/sextech_summary.pdf.

**10.** Amanda Lenhart, *Teens and Sexting: How and why minor teens are sending sexually sug-*

*gestive nude or nearly nude images via text messaging*, Pew Internet & American Life Project (December 2009), *http://www. pewinternet.org/Reports/2009/Teens-and-Sexting.aspx.*

**11.** *See* Elizabeth C. Eraker, *Stemming Sexting: Sensible Legal Approaches to Teenagers' Exchange of Self–Produced Pornography*, 25 BERKELY TECH. L.J. 555, 559–60 (2010).

their breakup (the girl had taken the photos of herself).[12] An eighteen-year-old Cincinnati woman committed suicide after nude pictures she had sent her boyfriend were circulated around her high school. *Id.* at 152. A sixty-year-old high school assistant principal was prosecuted for having semi-nude photographs of a young girl on his work computer; he had recently confiscated the photos from a sixteen-year old boy and was preserving them as evidence. The boy's own mother reported the incident to the police. *Id.* at 153.

Based on these stories, statistics, and commentaries, the court takes into account the proliferation of sexting among young people today and its unintended consequences as a factor in determining Mr. Nash's sentence.

The court also takes into account the number and type of images that were on Mr. Nash's cell phone. The four pictures, as despicable as they were, were not photographs of a prepubescent minor, were not masochistic, were not torture or bondage, and were not the totally-beyond-human-consideration photographs that are present in so many cases involving child pornography. No evidence exists that Mr. Nash shared these images with others— they were not uploaded on any file sharing device to be disseminated across the country and did not appear on his computer, only on his cell phone where E.L. had sent them by text. These four images were the only child pornography found on his phone or his computer. The court does not minimize the wrongness of Mr. Nash's conduct,

but notes that it is not as horrific as the conduct that the court must frequently address in the most common kinds of child pornography cases.

The court must also balance the history and characteristics of Mr. Nash. His age plays a significant role in his conduct and his sentence. Studies show that until age 25, the part of the brain that governs judgment, decision-making and impulse control is still in the developmental process.[13] Male brains specifically develop even more slowly than female brains; female brains develop an average of two years earlier than male brains.[14] In an NPR interview, Dr. Sandra Aamodt specifically noted that "[m]any of ... what we think of as the costs of adolescence ... are actually more issues with young adults, people in the 18 to 25 range, largely because they have more opportunities to get into these kinds of trouble...."[15]

Furthermore, Dr. Preston, who completed the forensic psychosexual evaluation of Mr. Nash, testified regarding these trends. After affirming that Mr. Nash suffered from untreated ADHD at the time of his relationship with E.L., Dr. Preston stated: "Well, there's a—a lot of recent research that says the brain doesn't fully mature until about the age of twenty-five, so we're seeing people with attention deficit hyperactivity disorder tend to be a little bit later on that curve, as well as exhibit some symptoms or signs of immaturity." He continued to explain that he thought "it would be more likely than not [Mr. Nash] would be below average on immaturity and

12. Robert H. Wood, *The Failure of Sexting Criminalization: A Plea for the Exercise of Prosecutorial Restraint*, 10 MICH. TELECOMM. & TECH L.REV. 151, 153 (2009).

13. National Institute of Health, Department of Health and Human Services, *Teen Brains: Still Under Construction*, NIH NEWS IN HEALTH (September 2005) *http://wwwnewsinhealth. nih.gov.*

14. Tony Cox, *Brain Maturity Extends Well Beyond Teen Years*, NPR (October 10, 2011, 12:00 PM) http://www.npr.org/templates/ story/story.php?storyId=141164708.

15. Tony Cox, *Brain Maturity Extends Well Beyond Teen Years*, NPR (October 10, 2011, 12:00 PM) http://www.npr.org/templates/ story/story.php?storyId=141164708.

the ability to do some of the socialization that most people his age would be able to do," and answered affirmatively when asked whether Mr. Nash's immaturity could have contributed to the conduct at issue in the hearing. (Transcript of Sentencing Hearing, November 7, 2013).

Based on the court's research and Dr. Preston's testimony, Mr. Nash's inappropriate relationship with E.L. occurred during a time when he was still incapable of fully adult decision-making. Although his age requires that he be treated as an adult, his immaturity is a factor that the court considers in sentencing.

The court finds· that Mr. Nash was a very immature, troubled twenty-two-year-old man at the time of the offense. He was in a consensual relationship with a sixteen-year-old girl—a relationship that was not wise, but was not in-and-of-itself illegal. Mr. Nash's ADHD was not medicated at the time, and he suffered from depression—factors that likely contributed to his unwise choices, although not excusing it.

The court also takes into account the steps he has taken since that time for therapy and treatment. Immediately after being arrested in July 2012, Mr. Nash voluntarily began intense counseling and treatment. He began seeing Dr. Preston on a monthly basis in July 2012 and then began seeing Lonnie Jones, a licensed therapist in November 2012. In March 2013 he also began seeing Dr. Scariya Kumaramangalam, a psychiatrist, who treated him and prescribed medications for Mood Disorder. Dr. Preston determined that "Mr. Nash is does [sic] not qualify as per the diagnostic criteria as a pedophile."

(Confidential Forensic Psychosexual Evaluation, pg. 8).

This extremely immature young man differs from the typical child pornography defendant who generally has a cache of hundreds of images obtained from peer-to-peer exchanges or from his own creation; instead Mr. Nash had four separate images sent to him by his *girlfriend*. Because of his young age and immaturity, the court questions whether the Bureau of Prisons can adequately accommodate and protect Mr. Nash—another reason why incarceration is not appropriate in this case.

The court must craft a sentence that reflects the seriousness of the offense and promotes the respect for the law. In doing so, the court specifically finds that a Guideline sentence would be excessive and would not provide respect for the law *in this particular case.* The court also considers the need to afford adequate deterrence to criminal conduct. Based at least in part on Dr. Preston's testimony, the court believes that Mr. Nash will not repeat his conduct or engage in any other similar conduct. The court finds no need for incarceration to protect the public from further crimes by him. The court will, however, impose terms and conditions that include treatment to make sure that Mr. Nash continues along the path of recovery that he is now on, and to ensure that deterrence and protection will not be an issue in the future.[16] This sentence will allow for the needed correctional treatment in the most effective manner and will avoid unwarranted similarities in sentencing among *dissimilar* defendants.

Pursuant to the court's authority under *United States v. Booker* to impose a sen-

---

**16.** Those conditions include the standard conditions of supervised release, the standard sex offender conditions, and particularized conditions including specific sex offender/mental health treatment, six months home confinement, and community service that may in-

clude warning young people of the dangers of sexting. Those conditions are set out in the Judgment and Commitment Order filed simultaneously with this Memorandum Opinion.

tence outside the Guideline range, and following the guidance of *Gall,* 552 U.S. at 38, 128 S.Ct. 586, the court takes the extraordinary but not unprecedented step of placing Mr. Nash on probation for a term of sixty months. In making this determination, the court relies on several cases in which appellate courts have affirmed the imposition of probation in similar cases with similar or higher Guideline ranges.

In *United States v. Rowan,* the Fifth Circuit affirmed a sentence of sixty-months probation for a defendant convicted of child pornography whose Guideline range was 46–57 months. 530 F.3d 379 (5th Cir.2008). That court also affirmed a probationary sentence in *United States v. Duhon,* where the Guideline range was 27–33 months, noting that the defendant had no criminal history, posed no threat to the public, and would benefit most from psychological treatment. 541 F.3d 391 (5th Cir.2008).

In *United States v. Autery,* the Ninth Circuit affirmed a sixty-month sentence of probation for a child pornography defendant with a Guideline range of 41–51 months. 555 F.3d 864 (9th Cir.2009). The court explained the reasoning of the district court, which observed that the defendant did not "fit the profile of a pedophile" and that his case "differed from the 'hundreds and hundreds' of other child pornography cases the district court had adjudicated." *Id.* at 867–68. The court continued to note that the defendant "could not be accommodated adequately in a federal institution and that he needed outpatient psychiatric monitoring and management instead." *Id.* at 868 (internal quotations omitted). The district court had "determined that imposing prison time would create a much more disruptive

situation and, actually, could be more damaging than the rehabilitation regime the court believed would work." *Id.* (internal quotations omitted). The same rationale applies to Mr. Nash's situation.

Other courts have similarly varied from Guideline penalties because of exceptional circumstances in child pornography cases. *See United States v. Huckins,* 529 F.3d 1312 (10th Cir.2008) (affirming an 18 month prison sentence where the Guideline range was 78–97 months because the twenty-year-old defendant "did not fit the characteristics of the typical defendant who possesses child pornography," "immediately sought psychotherapy," and "made efforts to correct his life"); *see also United States v. Campbell,* 738 F.Supp.2d 960 (D.Neb.2010) (imposing a sentence of 60 months probation where the Guideline range was 41–51 months because the images involved "while cancerous, [do] not appear to be the metastatic variety that is the norm"); *United States v. Baird,* 580 F.Supp.2d 889 (D.Neb.2008) (imposing a two-year prison sentence where the Guideline range was 63–78 months because mental health professionals had found that the defendant was not a pedophile or sexual predator and was unlikely to reoffend).

By imposing probation, the court imposes much more than a slap on Mr. Nash's hand. He will forever be a convicted felon and will forever be labeled a "sex offender" in the state of Alabama. Although Mr. Nash's father pleaded with the court not to brand his son as such for the rest of his life, the court has no authority to avoid this overly-harsh, life-long result. Although Mr. Nash is a Tier I sex offender under federal law, requiring registration for only 15 years pursuant to 42 U.S.C. § 16915(a)(1), under the Alabama law bringing the state into compliance with the requirements of the Adam Walsh Child Protection and Safety Act, *all* adult sex offenders must register *for life.* ALA.CODE § 15–20A–3(b).[17] The sex offender label

17. Specifically, in Alabama, sex offender registration involves many collateral conse-

quences; for example,
• Publishing on a public website of the of-

that Mr. Nash's father pleaded with the court to avoid is statutorily mandated, and the court has no power to change this unwarranted life sentence unless Congress and/or the Alabama legislature change the law. The court considers the harshness of this "life sentence" in imposing probation in this case.

In an article addressing a similar law in Missouri,[18] the author noted: "The registry is today's ultimate 'scarlet letter.' Long after they've served their time, sex offenders remain barred from parks and schools and limited in their employment and housing options. Their names and faces are posted on the Internet, easily accessible to friends and neighbors." [19] Such a "scarlet letter" seems particularly harsh for a young man who possessed four photos sent to him by his girlfriend with whom he had a legal and consensual sexual relationship—certainly an unintended consequence of sexting.

According to a 2012 survey by the National Center for Missing and Exploited Children, over 736,000 sex offenders were registered in the United States at that time.[20] When that registry includes the full range of sex offenders—from those

like Mr. Nash who engaged in sexting with his girlfriend to the hard core child predators—the effectiveness of the registry wanes. The court does not criticize the implementation of these restrictions in many circumstances, but simply notes that even Mr. Nash's probationary sentence involves serious, tangible consequences that will follow him for the rest of his life.

As part of his conditions of probation, after completion of some treatment, the court requires Mr. Nash to participate in five hours of community service under the supervision of the probation officer. The court is convinced that Mr. Nash has many positive gifts to give back to the community, but first needs to benefit from further treatment. In a few years, when Mr. Nash and his probation officer, in consultation with his treatment provider, believe the time is right, the court urges that Mr. Nash consider speaking out against sexting and the problems that it has caused. Although young people may not listen to this court, they need to know that sexting is a very real problem that can have very real, unexpected consequences. Mr. Nash, as someone who is facing those consequences, is in an ideal position to tell them.

fender's personal information, including name, address, employer, school attendance, photo, license plate number, and criminal history of any sex offense, ALA.CODE § 15–20A–8;
- Requiring the offender to appear in person every three months to verify registration information, ALA.CODE § 15–20A–10;
- Prohibiting the offender from residing or staying more than three consecutive days in a living accommodation within 2,000 feet of any school or childcare facility, ALA.CODE § 15–20A–11;
- Prohibiting the offender from working or volunteering in a school or other facility or business that provides services primarily to children, ALA.CODE § 15–20A–13; and
- Requiring the offender to report in person and procure a travel permit before leaving his or her residence for three or more con-

secutive days and procure a permit at least 21 days in advance before traveling outside of the country, ALA.CODE § 15–20A–15.

18. The Alabama law, unlike the Missouri law, does not require lifetime registry of *juvenile* sex offenders.

19. Kevin McDermott, *Registry: Is it fair for sex offenders to stay listed on a registry for life?*, ST. LOUIS POST-DISPATCH (August 26, 2013 6:30 AM), http://www.stltoday.com/news/local/govt-and-politics/is-it-fair-forsex-offenders-to-stay-listed-on/article_f481ecef-de1e-53bf-8e0b-b3b9f064e78f.html.

20. 2012 Annual Report, National Center for Missing and Exploited Children, pg. 5, available at www.missingkids.com/en_US/publications/NC171.pdf.

The court does not require this of Mr. Nash—it only requires the five hours of community service—but desires that Mr. Nash consider this request in a few years.

The message of the damages of sexting and the egregious consequences it can bring is one that needs to be shared with teenagers and young people, legislative bodies, and members of the justice system.